CHARLES E. BURGESS, Appellant, *v.* FIRST NATIONAL BANK and Another, Respondents.

Second Department, February 4, 1927.

Master and servant — action by assignee of former employee of bank to recover alleged bonus — bank instituted plan for sharing profits with faithful employees — administrative committee was final authority under agreement on all questions — agreement provided for non-withdrawal of amounts credited except upon completion of employment or upon resignation with written consent — administrative committee had power to forfeit amount credited in case employee was not faithful — plan specifically stated that employee would not have vested interest and that interest might be lost by inefficiency, lack of industry or disloyalty — plaintiff's assignor committed some error and was fined $1,000 against amount credited, and later resigned without written consent — neither said employee nor his assignee has any right in fund credited to employee.

This is an action to recover from the defendant bank an amount credited to plaintiff's assignor under a plan instituted by the bank, whereby its faithful employees might share in the profits made. The plan of profit sharing provided that the action of the administrative committee consisting of bank officers and employees should be final on all questions; that the amount credited to each employee should be determined by the administrative committee and should not constitute a part of the salary or a bonus, but should be a gratuity given to encourage the employees who remained faithful, industrious and loyal to the bank; that the amount so credited could not be withdrawn, except upon the completion of service, or with the consent of the administrative committee upon termination of employment by resignation with consent in writing of certain officers; that the amount credited to the employee might be forfeited for any dereliction in duty or loyalty and in case the employee left the service without the written consent of the chairman and the president of the bank, or in case he should be discharged for just cause, and that the amount so credited in case of forfeiture was to be added to the profit-sharing fund of the employees for the year the forfeiture was determined. The plaintiff's assignor committed some error in his work and was fined $1,000 which was charged against the amount credited to him in the profit-sharing plan. He tried to obtain a rehearing but was unable to do so and after an unsuccessful attempt to procure the written consent of the chairman and of the president of the bank to his resignation, he resigned without such consent and left the service of the defendant bank.

All rights of the plaintiff's assignor in the fund were forfeited, legally, under the plan for profit sharing upon his resignation from the bank without written consent and, therefore, his assignee cannot recover the amount that was credited to him at that time.

APPEAL by the plaintiff, Charles E. Burgess, from an order of the Supreme Court, made at the Westchester Special Term and entered in the office of the clerk of the county of Westchester on the 17th day of May, 1926, granting defendants' motion for judgment on the pleadings, and also from a judgment entered in said clerk's office on the 25th day of May, 1926, pursuant to said order.

*John J. Finn,* for the appellant.

*Joseph M. Hartfield* [*James Adam Murphy* with him on the brief], for the respondents.

KAPPER, J. Plaintiff sues as the assignee of one James A. Fagan who had been a clerk in the defendant bank. The complaint alleges that Fagan was entitled to share " in all the rights, privileges and benefits of a certain plan of profit sharing and endowment which had theretofore been adopted and promulgated by the board of directors of the said First National Bank," of which bank he had been an employee for several years, and so remained continuously until March 31, 1924, when he " *resigned.*" Plaintiff then sets forth the " Plan of profit sharing and endowment fund," in effect at the bank and as affecting its employees. Then follow allegations that the amount of the fund which the defendant created under said plan and credited to Fagan on its books amounted to $3,825, of which he had withdrawn (presumably as permitted) the sum of $465, leaving, as plaintiff claims, the sum of $3,360 in said fund, due and owing to Fagan and for which plaintiff, as Fagan's assignee, is entitled to judgment.

The complaint also informs us that on January 11, 1924, Fagan " had committed some alleged clerical error in the course and discharge of his duties as an employee of the First National Bank " with the result that on the recommendation of the bank's cashier to the " administrative committee " in charge of said fund, Fagan claims to have been fined $1,000 against the credit which he had in said endowment fund; and that the fine was imposed upon him without notice or an opportunity to defend; that he made efforts to have a rehearing before the bank's president and cashier, all of which was refused him, following which, and on or about March 31, 1924, Fagan " *resigned* his position in the First National Bank."

The question, narrowed to its real meat, is whether or not Fagan's rights as an employee in and to what would be his share in this endowment fund, was a vested right, the same as though

he had earned the money and due to him as part of his salary or wages, or whether this fund was wholly conditional upon the employee's continuance in the employment or compliance with whatever exactions were announced in the plan as a condition precedent to a sharing therein.

The purpose of the plan pleaded is stated at its outset, viz.:

" 1. Purpose: The purpose of this Plan is to encourage, on the part of the employees of the bank, education, permanency, and qualification for future usefulness and promotion, and to augment their efficiency, industry, and loyalty, by giving them a participation in the prosperity of the bank resulting from the exercise by them of the foregoing qualities, and providing for the forfeiture of such participation in the event of the failure to exercise them."

Next we have the heading " Annual Endowment Fund; " and from it we learn that the bank *decided* to pay to the administrative committee at or near the close of each year " a sum equal to 10 per cent of the combined profits of the bank and the First Security Company for the year in excess of an amount equal to 10 per cent of the average combined capital, surplus, and undivided profits of the two corporations for the year." The next provision is that the administrative committee are to administer the plan, such committee to consist of two bank officers and three employees appointed by the board of directors (I take it of the bank), and then this follows: " The decision of this Committee shall be *final* upon all questions of interpretation and application of the Plan, the designation of employees entitled to participation in the benefits and the forfeiture of such benefits."

Then follows the basis of participation which shows a further power in the administrative committee to " determine each employee's participation according to the determination of the value and importance of the service rendered by such employee." The percentages of participation seem to be provided for according to the length of service, together with withdrawal in cash in part of credits, with this limitation: " Otherwise the principal may be withdrawn only upon termination of the employment. The interest may be withdrawn." The most important provision is that which I shall now quote, viz.:

" 7. Forfeitures and their Disposition: Inasmuch as fair going compensation is paid all employees, and generous cash additions thereto are afforded by the provisions of Section 6 hereof, it must be clearly understood that the further additional amounts tentatively credited to the participants are not to be subject to withdrawal during the continuance of the employment but are in the nature of a bonus or gratuity designed, *first*, for the protection

of the employees and their families at the termination of the full period of employment of the respective participants, and *second,* such benefit as the Administrative Committee may accord any participant resigning with the written consent and approval of the Chairman and the President. The intent of the Plan is that no employee shall gain in any Annual Endowment Fund an interest so permanently vested that he cannot later lose it by his inefficiency, lack of industry or disloyalty as determined by the Administrative Committee. Notwithstanding any annual allotment to an employee in the benefits of the Plan he shall forfeit any right to receive such benefits in the event that he shall voluntarily leave the service of the bank without the written consent of the Chairman and the President of the bank, or shall be discharged for just cause. All sums theretofore temporarily credited employees leaving the service or discharged, and forfeited as herein provided, shall be added to the profit sharing fund of the employees for the year the forfeiture is determined."

The appellant contends that this plan provides for a *bonus* which vested Fagan's share in it in him, and to which he would have been entitled upon a severance of his employment by the bank. Cases are cited by him but they seem to me to involve the usual one of *bonus* and in reality a part of the wages to be paid to the employee. For instance, in *Zwolanek* v. *Baker Mfg. Co.* (150 Wis. 517; 137 N. W. 769) the plaintiff was employed by the defendant for one year at an hourly wage, the agreement providing that neither party could terminate it without the consent of the other with the further exception that if either party failed of performance then the other might terminate the contract upon one month's notice; there was a continuation from year to year under the terms of the original contract, with the exception of some advance in pay. It appeared further that the company adopted a plan whereby certain " surplus earnings should be divided between capital and labor in proportion to the amounts received by each; " then followed a method of division of these surplus earnings so that each employee who regularly served 4,500 hours during 100 consecutive weeks " shall thereupon begin to participate in profit sharing, provided he does not quit the employ of the company or is not discharged *prior to January 1 of any year.*" The complaint alleged plaintiff's compliance with the terms of the hours of employment and demanded the annual proportionate part of the fund coming to him under the agreement. The defense was that this agreement was not a part of the contract of employment. It was found that the defendant had discharged the plaintiff for the sole object of preventing him from participating in this fund,

and that as the plaintiff had complied with the full 4,500 hours of employment in 100 consecutive weeks, he was entitled to share in this fund which was due and payable annually.

In *Zampatella* v. *Thomson Crooker Shoe Co.* (249 Mass. 37; 144 N. E. 82) the agreement was one to pay a fifteen per cent bonus on the yearly earnings; and on a consideration of the evidence it was found as a fact to be a legal contract to pay the bonus and that it was not a mere gratuity.

*Roberts* v. *Mays Mills* (184 N. C. 406; 114 S. E. 530) was also a case of bonus and not of gift. The following was the declaration of the company under which this construction of bonus was adopted by the court: " 15 January, 1920. On 15 November we posted notice stating that we had made preliminary estimate of our accounts for the year 1919, sufficiently definite to warrant our announcing that on 29 December we would make an increase of 10 per cent. in the wages of all mill operatives, and also would again pay the 5 per cent. bonus at Christmas time in 1920. We have now completed our accounts for 1919, and find that it is possible for us to not only advance wages 10 per cent., which was done on 29 December, but also to pay 10 per cent. bonus at Christmas time in 1920 instead of 5 per cent. bonus. Therefore, a 10 per cent. bonus will be paid at Christmas time in this year to those who have been continuously in the company's employ since this present month of January. Mays Mills, Incorporated, Maysville, N. C."

The distinction between the statement last quoted and the plan in the case at bar requires no argument.

Nothing is cited by either party that may be said to be precisely in point. But I do think that two cases which are presented by the respondents strongly support the view that this instrument is not a part of the contract of employment from which an absolute right to participate in the fund may be said to arise. In *McNevin* v. *Solvay Process Co.* (32 App. Div. 610; affd., on this opinion, in 167 N. Y. 530) a manufacturing corporation established a pension fund for the benefit of employees, no part of which fund was derived from the wages of the employees or contributed by them, the fund being voluntarily set apart by the corporation from its profits; and rules were adopted for the establishment, administration and application of the fund, providing that the fund should be " absolutely subject to the control of its trustees," and that an employee could in no case demand payment of the sum accredited on his account except when the corporation should adjudge the account to be payable. Pass books were issued to the employees and from time to time an amount was accredited therein to such employee from such fund. A further provision in the plan author-

ized the trustees to decide all questions concerning the fund *without appeal.* The ·trustees of the fund, after a hearing of the plaintiff, an employee, who demanded the amount accredited upon his pass book, decided that the gift, in order to go to him, would have to be completed by actual payment before he obtained any *vested* interest in it. The court held that the corporation was not liable to the employee for the sum so credited upon his pass book. The opinion was by Follett, J., and concurred in by Hardin, P. J., and Adams, J.; Ward and Green, JJ., dissenting. The dissent must be passed by because the Court of Appeals adopted Judge Follett's opinion. In the course of that opinion it was said (p. 612): " It is conceded that this pension fund has been created voluntarily and is a gift by the defendant, and the question upon which this case turns, is whether, when a sum is credited to an employee on the pass book furnished by the defendant, the employee has a vested right in the sum so credited, or whether, under the terms by which the fund is established, the employee acquires no vested right until the gift is completed by actual payment to the employee? It must be conceded, at the outset, that a person or a corporation proposing to give a sum for the benefit of any person or any set of persons has the right to fix the terms of his bounty, and provide under what circumstances the gift shall become vested and absolute. Under the regulations established it seems to me that none of the employees has a vested interest in any part of this fund, even though credited upon their pass books, until the gift is completed by actual payment. Until that time it is an inchoate gift. The articles provide that an employee cannot in any case demand payment of the sum credited to his account, except when the defendnat shall adjudge the account to be payable in whole or in part, according to the rules and regulations established, and it is also provided that the sums credited shall remain the property of the defendant until actually paid, and that the fund shall be and remain under the sole control of the defendant's trustees, who are authorized to decide all questions concerning it without appeal. In this case the defendant's trustees decided after a hearing of the plaintiff that he was not, when the action was begun, entitled to payment of any portion of the fund credited to him, and it seems to me that, under the terms of the gift, this decision is final, unless within the discretion of the defendant's trustees it shall be modified in the future." ˙

Of course there are some distinctions between the plan in the case cited and the present plan. But, in its material and important aspects, I do not think there is any distinction. At bar we find the administrative committee to be a court of last resort upon all

questions of interpretation and application of the plan as well as the designation of employees entitled to participation in the benefits and the forfeiture of such benefits; that beneficiaries are to be determined by the administrative committee according to the determination of the value and the importance of the service rendered by such employee; that the principal of the fund may only be withdrawn upon the termination of the employment; that as the bank is paying a fair going compensation to all employees, and as the plan itself provides for generous cash additions to the salary (which Fagan admits he received), the plan then says that there must be a clear understanding that further additional amounts " tentatively credited to the participants " are not subject to withdrawal during employment but are in the nature of a gratuity designed, *first*, for the protection of the employees and their families when their period of employment is terminated, and *second*, such benefit as the administrative committee may accord any participant who resigns with the written consent and approval of the chairman and the president. Then follows what seems to me to be the absolute right of this bank to place their own construction upon this plan, the " intent " of which they say is that no employee " shall gain in any Annual Endowment Fund an interest so permanently vested that he cannot later lose it by his inefficiency, lack of industry or disloyalty *as determined* by the Administrative Committee." Then is the further declaration that notwithstanding any annual allotment to an employee " he shall forfeit any right to receive such benefits in the event that he shall voluntarily leave the service of the bank without the written consent of the Chairman and the President of the bank, or shall be discharged for just cause." Now, what does the bank do with this share so forfeited? Do they put it back in their exchequer? No, but they throw it all into the common pot to make an increased credit to the other employees for the year in which the forfeiture is determined.

In *Dolge* v. *Dolge* (70 App. Div. 517) there was also, as in the *McNevin* case, a pass book in which was credited the share of employees in a plan known as the " earnings division accounts " of a business, the plan also embracing pension, insurance and endowment features. The claim was made that the amounts credited belonged to the employees. The plan was considered, and was found to read, in part (p. 520): " It is distinctly understood that all and every of the provisions of this law are voluntary on behalf of said house of Alfred Dolge, and that this law does not, nor does any of the provisions herein contained confer any legal right or create any legal right in favor of any employee of said house mentioned herein, or of any person or persons whomsoever,

nor any legal liability on behalf of said house of Alfred Dolge, or of said Alfred Dolge, either in law or in equity."

The contention was made by the employees that while the offers were voluntary on the part of Dolge, and in and of themselves without binding force, yet when accepted and acted upon by the employees, they became binding upon Dolge and when the promised credits were actually given upon the pass books, the employees had a vested right in the sum or sums so created. This contention was overruled by the Appellate Division, and it was said, *inter alia* (p. 521): " These transactions could not be upheld as a gift to the employees. Merely giving credit upon their pass books for certain amounts did not constitute a valid gift. To sustain a gift of this character there must have been on the part of Dolge an intent to give and an actual payment and complete delivery of the money to or for the employees, wholly divesting Dolge of the control of it."

In the last case cited, the *McNevin Case* (*supra*) was followed. Of course, there is also to be considered a suggestion in the *Dolge* case that had the fund been set apart and the amounts entered in the pass books so that the claimants could have drawn the sums placed to their credit, then their claims might be upheld. In the case now before us it is not pretended that there could be a withdrawal of this fund until the employment had terminated, and then only upon a termination in the manner stipulated in the written plan.

The learned Special Term justice, in granting the defendants' motion for judgment on the pleadings, said: " Plaintiff pleads himself out of court by alleging in his complaint, in effect, that his assignor tried to obtain the required consent and approval; that he failed to obtain it; and that thereupon he resigned without it. Having left voluntarily and under the circumstances detailed, it is clear that he has relinquished any interest which he might have had in the fund in question, which a reading of the plan shows was only accorded to him temporarily as a gift or gratuity, and was subject to be defeated, *inter alia*, by his voluntary resignation without the prescribed consent and approval."

I think the case was correctly decided by the Special Term, and that the order granting defendants' motion for judgment on the pleadings, and the judgment entered thereon, should be affirmed, with ten dollars costs and disbursements.

Present — Kelly, P. J., Manning, Young, Kapper and Lazansky, JJ.

Order granting defendants' motion for judgment on the pleadings, and judgment entered thereon, unanimously affirmed, with ten dollars costs and disbursements.